IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ODIS L. TABOR                    )
                                 )
        Plaintiff,               )
                                 )
        v.                       )        1:08CV34
                                 )
FREIGHTLINER OF CLEVELAND, LLC   )
                                 )
        Defendant.               )

**MEMORANDUM OPINION AND ORDER**

OSTEEN, JR., District Judge

        Presently before the court is Defendant's Motion for Summary

Judgment. (Doc. 17.)  Plaintiff has filed a Memorandum in

Opposition to Defendant's Motion for Summary Judgment (Doc. 20),

and Defendant has filed a Reply (Doc. 21).  Counsel for both

parties appeared at a hearing on March 13, 2009.  This motion is

now ripe for decision from the court.  For the reasons set forth

below, Defendant's Motion for Summary Judgment will be granted.

I.      **Background**

        Plaintiff Odis L. Tabor ("Plaintiff") initiated this lawsuit

against Defendant Freightliner Truck Plant Cleveland, LLC

("Freightliner" or "Defendant"), alleging that he was terminated

from his employment because he is bi-racial, in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et</u>

seq. ("Title VII").  As this is a motion for summary judgment, the facts set forth below are either undisputed or viewed in the light most favorable to Plaintiff.

Defendant is a subsidiary of Daimler Trucks North America, LLC ("DTNA"), a manufacturer of commercial trucks.  Plaintiff worked at DTNA's Cleveland, North Carolina manufacturing facility from March 2, 2004 until his discharge on February 5, 2007.  During this time, he was an hourly rate employee and a shop steward for the third shift cab line employees at the Cleveland facility, where the hourly employees are represented by the United Auto Workers Union, Local No. 3520.  Plaintiff testified in his deposition that he is bi-racial; his mother is African American and his father is Caucasian.  (Tabor Dep. Vol. I at 184.)  Plaintiff also alleges that he told his supervisors and a member of management that he was bi-racial on a number of occasions, beginning in January 2006.  (Tabor 2d Aff. ¶ 2.)

Several incidents between Plaintiff and Jerry Lovell, an African American employee, preceded Plaintiff's termination.  The first occurred on October 27, 2006 (hereinafter "overtime incident").  Plaintiff, in his capacity as union representative, told Mr. Lovell that he was not eligible for some available overtime work because he had not signed up in time.  Mr. Lovell allegedly responded by telling Plaintiff, "You ain't worth a damn. . . . You ain't nothing but a white man's n****r. . . . You

2

ain't s\*\*t, I'm going to whip your ass." (Tabor Dep. Vol. I at
180-84.)  According to Plaintiff, two supervisors and a manager
witnessed the incident.  (<u>Id.</u> at 183.)  Plaintiff responded by
saying, "if . . . you come up to me to try to hurt me or to
bother me, then you're going to have respiratory problems.  And
it's going to be between you and Jesus if you live or die,
because I'm going to drop you."  (<u>Id.</u> at 185.)  Mr. Lovell then
apparently walked towards Plaintiff "with his fist balled and
with expressions on his face of hostility."  (<u>Id.</u> at 188.)  At
that point, the supervisors stood in front of the two men to
separate them and a manager told them to stop.  (<u>Id.</u> at 189.)

     Plaintiff then requested that all parties go to Human
Resources to report the incident.  (<u>Id.</u>)  Once at the Human
Resources office, Plaintiff said he was "too upset at the moment
to give a statement."  (<u>Id.</u> at 192.)  When Plaintiff returned to
work the following day, Human Resources specialist Amanda Bilyeu
told him that he was suspended.  (<u>Id.</u> at 195.)  At that time,
Plaintiff had apparently prepared a statement, but did not give
it to Ms. Bilyeu.  (<u>Id.</u> at 195-96.)  Plaintiff received a ten-day
suspension, and Mr. Lovell received a five-day suspension.[1]  (<u>Id.</u>

_____

     [1] Ms. Bilyeu's affidavit suggests that Mr. Lovell did submit
a written statement to the company regarding the incident.
(Bilyeu Aff. ¶ 7.) Richard Klinedinst, who was Human Resources
manager at the time, said that he consulted with the union and
agreed to suspend both men for ten days, but would reduce the
suspensions to five days each if they accepted the discipline
unprotested.  (Klinedinst Aff. ¶ 8.)  "Lovell agreed not to
protest the discipline, so he got a five-day suspension.  Tabor

at 199.)  When Plaintiff returned to work after his ten-day suspension, he provided the company with the written statement. (Id. at 196-97.)

The second incident occurred on January 5, 2007.  Plaintiff, in his capacity as a union representative, was speaking at a team "huddle" meeting at the Cleveland facility.  Plaintiff stated that while he was giving out information at the beginning of the meeting, Mr. Lovell "came up and started saying offensive things" including, "He ain't s**t, don't listen to what he got to say. . . . He hangs out with the white boys."  (Id. at 213-14.)  The supervisor on duty referred Plaintiff to Human Resources, and Plaintiff explained to Ms. Bilyeu what had happened.  (Id. at 214.)  Ms. Bilyeu and Steve Barber, a union representative, investigated the incident by obtaining statements from various witnesses.  (Id. at 215.)

Following the investigation, Plaintiff complained that management had not taken any action against Mr. Lovell as a result of his conduct at the huddle meeting.  (Id. at 217.)  However, the statements Ms. Bilyeu obtained from the employees who witnessed the incident did not completely corroborate Plaintiff's recollection of the incident.  Specifically, the witnesses all heard Mr. Lovell say things directed at Plaintiff,

---

did not, so he was suspended for 10 days.  Both men were also ordered to undergo anger management counseling."  (Id.)

4

but they heard Mr. Lovell say something to the effect of, "You all are crazy as hell," or "Don't listen to him, he is not going to represent you anymore." (See generally Bilyeu Aff. Ex. C.) Based on these statements, Ms. Bilyeu determined that Mr. Lovell "had made some snide comments during the huddle meeting but nothing that warranted formal discipline." (Bilyeu Aff. ¶ 9.) Nevertheless, Ms. Bilyeu and Lynn Thayer, Manager of Personnel and Administration, "counseled Lovell, telling him that Tabor had not done anything wrong and that Lovell needed to keep the Union charges off the floor (that is, not discuss them at work)." (Id.)

The third incident took place on January 13, 2007 (hereinafter "union meeting incident"). Both Plaintiff and Mr. Lovell attended a union meeting in the West Rowan High School auditorium. (Tabor Dep. Vol. I at 231; Tabor Dep. Vol. II at 30.) On that evening's agenda was an official complaint by Mr. Lovell, attempting to have Plaintiff removed as union representative due to Plaintiff's behavior at the October 27, 2006 "overtime incident." (Tabor Dep. Vol. I at 219-20.) Plaintiff knew that the complaint against him was on the evening's agenda, and expected Mr. Lovell to appear at the meeting. (Id. at 220-21.) Plaintiff also testified that just before the meeting, he had taken a rubber or plastic toy knife that his son and godson were playing with and put it in his

briefcase.  (Id. at 221-22.)  In his deposition, Plaintiff acknowledged that the knife looked real, stating that "[i]t was a rubber, plastic toy that look [sic] like a knife." (Id. at 221.) At some point during the meeting, the toy knife fell out of his bag and he put it inside his coat.  (Id. at 223.)

The details surrounding what happened at the meeting vary, but this court will rely on Plaintiff's deposition testimony and the reports witnesses gave to Defendant, to the extent they are not in dispute.  Plaintiff was seated towards the front of the auditorium near or on the stage, facing the President, George Drexel.  (Id. at 230-31.)  At one point during the meeting, Plaintiff had the floor to respond to Mr. Lovell's comments. (Id. at 226.)  According to Plaintiff:

> Mr. Lovell said what he had to say, and he sat down. When I stood up to say what I needed to say, I said it. And when I addressed the issue, I had my back turned.  I had no idea that Mr. Lovell was coming up on me.  Mr. Lovell jumped up when I brought the issue, because a lot of people did not know that Lovell was angry because I addressed the issue of him calling me a white man's n****r.  And therefore, everybody in the place got upset.
> And when my back was turned, Mr. Lovell jumped up and left his seat and came up on the back of me, and I had no idea that he was even on the back of me coming down the aisle.  And people started yelling, "Don't let that man come up on you."  When I, - - they said, "OT turn around."
> When I turned around, Mr. Lovell was less than three feet from my back.  And when I had my hands in my pocket, it was a natural instinct for me to pull my hand out, because he startled me.  I stepped back.  And I did not know that the knife was in my hand.  And once I realized it, I kept my hand at my side and I continuously [sic] to walk backwards.

(Id. at 226-27.) At this point, Plaintiff testified that he heard someone yell, "He's got a knife," and "everyone got upset." (Id. at 232, 234.)

According to the statements of several witnesses, the meeting was quickly adjourned, and employees – some of whom apparently had children with them – quickly left the area. (See Bilyeu Aff. Ex. D.) The Sergeant-at-Arms, Todd Scott, was seated at the back of the auditorium during the meeting (Tabor Dep. Vol. I at 231), but he apparently responded by trying to get the knife from Plaintiff after he pulled it from his pocket (see Bilyeu Aff. Ex. D). The police were also called, but Plaintiff had already left by the time they arrived. (See id.)

Immediately after the incident, Plaintiff was suspended from his work at the Cleveland plant. (Bilyeu Aff. ¶ 11.) Ms. Bilyeu investigated the matter and gathered written statements from several employees who had been at the meeting. (Id. ¶ 12 and Ex. D.) She also learned that Plaintiff had been criminally charged with possessing weapons on school grounds. (Id. at ¶ 13; Tabor Dep. Vol. II at 30.) Ms. Bilyeu presented the information to Richard Klinedinst, who at that time was Human Resources Manager at the Cleveland facility. (Bilyeu Aff. ¶ 14; Klinedinst Aff. ¶ 14.) Mr. Klinedinst determined that the union meeting incident, "coupled with the October 27 threat against Lovell showed us that Tabor was a danger to our workplace." (Klinedinst Aff. ¶ 14.)

Plaintiff was terminated by Freightliner on February 5, 2007. (Tabor Dep. Vol II at 31.)

On December 13, 2007, Plaintiff filed a complaint in the General Court of Justice, Superior Court Division for Guilford County, North Carolina, alleging intentional discrimination on the basis of race in violation of 42 U.S.C. § 2000e-1(a). (Compl. ¶ 11.)  Defendant removed the case to United States District Court for the Middle District of North Carolina on the basis of federal question and diversity jurisdiction pursuant to 20 U.S.C. §§ 1332 and 1441.  (Notice of Removal ¶ 3.)  Following a period of discovery, Defendant filed a motion for summary judgment.

## II. <u>Legal Standard</u>

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates that no genuine issues of material facts exist, thus entitling the moving party to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  If the moving party has met that burden, then the nonmoving party must persuade the court that a genuine issue remains for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a <u>genuine issue for trial</u>."

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986) (citations and footnote omitted) (<u>quoting</u> Fed. R. Civ. P. 56).  In considering a motion for summary judgment, the court is not to weigh the evidence, but rather must determine whether there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  The court must view the facts in the light most favorable to the nonmovant, drawing inferences favorable to that party if such inferences are reasonable.  <u>Id.</u> at 255.  However, there must be more than a factual dispute; the fact in question must be material, and the dispute must be genuine.  Fed. R. Civ. P. 56(c); <u>Anderson</u>, 477 U.S. at 248.  A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.

**III.  Title VII Discrimination**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2 (2006).  A Title VII plaintiff may avert summary judgment through two avenues of proof.  <u>Diamond v. Colonial Life & Accident Ins. Co.</u>, 416 F.3d 310, 318 (4th Cir. 2005) (internal citations omitted).  "A

plaintiff can survive a motion for summary judgment by presenting
direct or circumstantial evidence that raises a genuine issue of
material fact as whether an impermissible factor such as race
motivated by the employer's adverse employment decision." Id.
Alternatively, a plaintiff may proceed under the "pretext"
framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S.
792 (1973). Id.[2]

Under McDonnell Douglas, the plaintiff bears the burden of
production and must establish a prima facie case of
discrimination by the preponderance of the evidence. Evans v.
Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir.
1996). If the plaintiff-employee is successful at that step, the
defendant-employer then has the opportunity to present a

---

[2] The parties seem to differ on the effect of the Supreme
Court's decision Desert Palace, Inc. v. Costa, 593 U.S. 90
(2003), on the standard for surviving summary judgment in Title
VII cases. (See Pl.'s Mem. in Opp'n to Def.'s Motion for Summ.
J. (Doc. 20) at 4; Def.'s Reply (Doc. 21) at 3-4.) The Fourth
Circuit has since explained that

> in Title VII cases, the "prima facie case" . . . is never
> by itself sufficient to permit a plaintiff to escape an
> adverse summary judgment ruling except in the rare
> instance when an "employer is silent in the face of the
> presumption" it raises. Even then, of course, as in
> every employment discrimination case alleging disparate
> treatment, "[t]he ultimate burden of persuading the trier
> of fact that the defendant intentionally discriminated
> against the plaintiff remains at all times with the
> plaintiff."

Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318-
19 (4th Cir. 2005) (citing Tex. Dep't of Cmty. Affairs v.
Burdine, 450 U.S. 248, 253-54 (1981)).

legitimate, non-discriminatory reason for its employment action.
Id. Once the employer meets this burden, the presumption of
discrimination created by the prima facie case "drops out of the
picture," and the plaintiff-employee must show that the
articulated reason was just pretext for discrimination.  Id.
(citing St. Mary's Honor Ctr. v. Hicks, 509 U.S 502, 511 (1993);
Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, 53 F.3d 55, 57-58
(4th Cir. 1995)).  "The plaintiff always bears the ultimate
burden of proving that the employer intentionally discriminated
against [him]."  Id. (citing Tex. Dep't of Cmty. Affairs v.
Burdine, 450 U.S. 248, 253 (1981)).

    Thus, under the burden-shifting model, "Plaintiff must first
establish a prima facie case of disparate treatment."  Jenks v.
City of Greensboro, 495 F. Supp. 2d 524, 527 (M.D.N.C. 2007).
The elements of a prima facie case will differ slightly depending
on the nature of the challenged employment action.[3]  See Burdine,
450 U.S. at 254 n.6.  To establish a prima facie case of racial
discrimination in the enforcement of employee disciplinary

_____

    [3] At the request of the court, the parties were asked to
brief the issue of what prima facie elements they believe apply
in this case.  (See Order and Notice of Hr'g, Feb. 17, 2009 (Doc.
24).)  Plaintiff suggested that the court look to Reeves v.
Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), for the
elements of the prima facie case.  (See Doc. 25.)  Defendant
suggested that the appropriate standard was set forth in Moore v.
City of Charlotte, 754 F.2d 1100 (4th Cir. 1985), and Cook v. CSX
Transportation Corp., 988 F.2d 507 (4th Cir. 1993).  This issue
was resolved at the March 13, 2009 hearing when Plaintiff agreed
that the Moore/Cook standards were appropriate in this case.

measures, the plaintiff must show (1) that he is a member of a class protected by Title VII; (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against him were more severe than those enforced against other employees. Cook v. CSX Trans. Corp., 988 F.2d 507, 511 (4th Cir. 1993) (citing Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985)).

A showing of disparate discipline "usually requires direct comparisons in order to raise a presumption that Defendant's disparate treatment stemmed from Plaintiff's [race] rather than from [his] actions alone." Jenks, 495 F. Supp. 2d at 528. "While exact symmetry between Plaintiff's situation or actions and those of others is not required, they must be materially similar." Id. (citing Moore, 754 F.2d at 1107). Furthermore, it is up to the trial court to assess the relative similarity of conduct or misconduct cited by the parties at the summary judgment stage. Id.; see also Moore, 754 F.2d at 1107 (noting that lower federal courts have the "difficult, but not unfamiliar, task of assessing the gravity of the offenses on a relative scale"). This court, in determining whether a prima facie case under Title VII has been made, must assess whether the record as a whole gives rise to a reasonable inference of

racially discriminatory conduct by the employer.  <u>Cook</u>, 988 F.2d
at 512 (emphasis added).

**IV.  <u>Analysis</u>**

Plaintiff proceeds under the <u>McDonnell Douglas</u> burden-
shifting scheme, and asserts that he "has already met his initial
burden to show that he was subjected to adverse employment action
as a member of a legally protected racial classification."
(Pl.'s Mem. in Opp'n to Def.'s Motion for Summ. J. (Doc. 20) at
5.)  The court first notes that, as discussed above, these are
not the only two elements needed to set forth a prima facie case
of discrimination.  Plaintiff further cites <u>Adickes v. S.H. Kress
& Co.</u>, 398 U.S. 144, 157 (1970), for the proposition that "at
summary judgment, the burden remains on defendant to disprove
plaintiff's case . . . ."  (Doc. 25 at 2.)  However, in <u>Adickes</u>,
the Supreme Court merely stated that the party moving for summary
judgment has "the burden of showing the absence of a genuine
issue as to any material fact . . . ."  <u>Adickes</u>, 398 U.S. at
157.[4]  Once the moving party has met this burden, the nonmoving
party must come forward with specific facts showing that there is
a genuine issue for trial.  <u>See</u> <u>Matsushita</u>, 475 U.S. at 587; Fed.
R. Civ. P. 56(e).

---

[4] At trial, the ultimate burden is at all times on Plaintiff
to prove intentional discrimination.  <u>Burdine</u>, 450 U.S. at 253.

After examining the pleadings, affidavits, and other proper discovery material, this court concludes that Defendant has shown that there is no genuine issue of material fact for trial. Specifically, Defendant has produced evidence demonstrating that no one outside of Plaintiff's protected class engaged in comparable conduct and received less severe discipline for that conduct. Plaintiff has failed to advance sufficient admissible[5] proof showing that he had been disciplined more severely than other employees outside his protected class. Thus, "there [is] no disparity of treatment from which one could conclude that his discipline was a product of racial discrimination." Cook, 988 F.2d at 512.

There is sufficient evidence regarding the first element of the prima facie case of discrimination, as Plaintiff alleges discrimination based on race, a class protected by Title VII.[6] However, the record lacks sufficient admissible evidence that Plaintiff's conduct was comparable in seriousness to misconduct of employees outside the protected class, or that the

_____

[5] Rule 56(e) states that affidavits submitted in support or opposition to summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e).

[6] Plaintiff alleges that he is bi-racial. Defendant and Plaintiff do not brief the issue of how Defendant's race might affect the analysis. Because it is not necessary to the decision, the court assumes without deciding that Plaintiff is a member of a protected class.

disciplinary measures taken against him were more severe than those taken against other employees. Plaintiff provides a list of ten incidents - alleged assaults and threats of death and physical injury, "made both on premises and off-premises by both black and white employees, who either received no discipline whatever, or had the disciplinary action against them rescinded[.]" (Doc. 20 at 8-10; <u>see also</u> Tabor Aff. ¶ 3.) The court concludes that these allegations are either based on inadmissible evidence or are insufficient to raise a genuine issue regarding the second and third elements of a prima facie case of disparate discipline.

Incident One[7] alleges that Mr. Lovell threatened to whip a fellow employee, Jomo Julue, after work. In his affidavit, Plaintiff states that "[t]hese facts were admitted to me by Mr. Jones in the course and scope of his duties as a supervisor." (Tabor Aff. ¶ 3a.) However, Plaintiff has not submitted a sworn statement of Mr. Lovell or Mr. Julue, the persons who were apparently involved who would have personal knowledge of the incident. <u>See</u> Fed. R. Civ. P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that

---

[7] Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 20) sets forth ten numbered incidents that he alleges are comparable to his own but where either no discipline was imposed or the disciplinary action was rescinded. (Doc. 20 at 8-10.) For ease of reference, the court will refer to the incidents named in this memorandum by the number used by Plaintiff in his Memorandum.

would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."). Even assuming the threat itself is admissible, it is not clear that Mr. Jones's statement to Plaintiff is admissible as an admission of a party opponent, as there is no evidence that Mr. Jones's authority as supervisor included authority to make a statement on behalf of Defendant concerning disciplinary measures. See Precision Piping & Instruments, Inc. v. E.I. Dupont de Nemours & Co., 951 F.2d 613, 619 (4th Cir. 1991) ("authority in the context of 801(d)(2)(C) means 'authority to speak' on a particular subject on behalf of someone else."). Nor is there any indication of whether Mr. Jones witnessed the incident himself or learned about it through another person, whose statement could also constitute hearsay.

Plaintiff also alleges that he has "personal knowledge" of several other incidents based on information he received in the course of his duties as a union representative investigating these matters. However, Incidents Five and Eight[8] are based on

---

[8] Incident Five alleges that Jomo Julue committed assault with his motor vehicle, attempting to hit several female black employees. (Doc. 20 at 9; Tabor Aff. ¶ 3d; Tabor Aff. Ex. 2.) Ms. Bilyeu, in her reply affidavit, responded that management was unable to verify the alleged car incident, but warned him about it in a letter. (Bilyeu Reply Aff. ¶ 6; Tabor Aff. Ex. 2.)

Incident Eight alleges that James Wilson, a white employee, made threats that he was going to have a hit list and was going to kill fellow employees. (Doc. 20 at 9; Tabor Aff. ¶ 3g; Tabor Aff. Ex. 6.) Ms. Bilyeu's reply affidavit states that she is "not personally familiar with the incident."

secondhand information Plaintiff apparently learned through
others or through other unauthenticated hearsay documents
submitted as exhibits.  (See id. at ¶¶ 3d, 3g and Exs. 2, 5).
Furthermore, these allegations are unconfirmed by Ms. Bilyeu, a
person who might have personal knowledge of the incidents, or at
least knowledge of the disciplinary actions taken against these
employees.  See supra note 8.  These alleged incidents are
therefore not supported by admissible evidence and will not be
considered by the court.

Regarding the remaining incidents (Two, Three, Four, Six,
Seven, Nine, and Ten), Plaintiff either has asserted personal
knowledge due to his presence at the incidents, or the incidents
are confirmed or corroborated by Ms. Bilyeu in her reply
affidavit.  Nevertheless, the evidence regarding these incidents
is still insufficient for a jury to conclude that Plaintiff's
discipline was a result of intentional discrimination.  The
remaining incidents are either (1) not comparable to Plaintiff's
behavior at either the "overtime incident" or the "union meeting
incident" or (2) resulted in the same disciplinary measures as
those imposed on Plaintiff.

Specifically, Incidents Two and Three describe two
altercations between Mr. Lovell and Desmond Ward.  In each case,
there was a verbal exchange between the men, but before they
could make bodily contact, they were pulled apart.  (Doc. 20 at

8; Tabor Aff. ¶ 3b.)  Plaintiff states that he personally broke up these altercations, and thus the court assumes he has personal knowledge of the incidents.  (Tabor Aff. ¶ 3b.)  Still, these incidents are not comparable to Plaintiff's behavior.  Unlike the "union meeting incident," there is no evidence here that any weapon[9] was involved in these altercations.  Nor can these incidents be used as a comparisons to the "overtime incident," as there is no evidence of any verbal threat of death or bodily harm.  Furthermore, following the "overtime incident," it was Plaintiff who insisted that the parties report the incident to Human Resources.  (Tabor Dep. Vol. I, 189.)  According to Ms. Bilyeu, Incidents Two and Three were not reported to Human Resources.  (Bilyeu Reply Aff. ¶ 4.)

This court will also assume that Plaintiff has at least some personal knowledge of Incident Ten, Mr. Lovell's behavior at the

---

[9] Even assuming that the knife Plaintiff displayed was a toy knife that simply resembled a real knife, its use could seen as threatening to Mr. Lovell or to others who experienced the confrontation.  Although Plaintiff claims he was not aware that he was holding the toy knife, others around him saw the knife and became upset as a result.  (Tabor Dep. at 232, 234.)  Furthermore, the use of a toy weapon during the commission of a crime is often deemed the culpable equivalent to the use of a real weapon in the context of a criminal conviction.  See, e.g, United States v. Martinez-Jimenez, 864 F.2d 664, 668 (9th Cir. 1989) ("A robber's use of a replica or simulated weapon that appears to be a genuine weapon to those present at the scene of the crime, or to those charged with responsibility for responding to the crime, carries the same penalty as the use of a genuine weapon."), cert. denied, 489 U.S. 1099 (1989).  Plaintiff has not presented any facts to suggest the presence of a toy weapon was less threatening because it occurred in the employment context.

union meeting, even though Plaintiff by his own admission, "had no idea that [Mr. Lovell] was even on the back of me coming down the aisle" and when he did turn around, "Mr. Lovell was less than three feet from my back." (Tabor Dep. Vol. I at 227.) But even assuming that Plaintiff accurately characterizes Defendant's behavior as an "imminent attack"[10] (Doc. 20 at 10), Mr. Lovell's behavior at the union meeting is still not comparable to Plaintiff's, as there is again no evidence suggesting Mr. Lovell brandished any type or weapon, either real or fake. See Moore, 754 F.2d at 1107 ("the 'comparison [of offenses] can be made in light of the harm caused or threatened to the victim or society . . . .'" (quoting Solem v. Helm, 463 U.S. 277, 292 (1983)).

The evidence regarding Incidents Four, Six, Seven, and Nine[11] shows that the employees who engaged in behavior that could be arguably comparable to Plaintiff's were given the same discipline

---

[10] This court will make this assumption for purposes of summary judgment, but notes that the witness statements all suggest that Mr. Lovell did not pose a threat to Plaintiff, nor was he acting aggressively towards Plaintiff. (See generally Bilyeu Aff. Ex. D.)

[11] Plaintiff's allegations regarding these incidents are either again based on hearsay or on information he learned "in the course and scope of [his] business as a union representative." (Tabor Aff. ¶¶ 3c, 3e, 3f.) Nevertheless, Ms. Bilyeu has admitted some familiarity with a few of the incidents as set out in her reply affidavit and thus the court assumes that these incidents are not in dispute. However, to the extent that the facts are in dispute, the court will rely on Ms. Bilyeu's knowledge of the incidents and of the disciplinary action taken against the employees.

as Plaintiff.  Specifically, Incident Four involved an African
American Muslim employee, Mr. Montgomery, allegedly harassing a
white Christian coworker based on his race and religion.  (See
Doc. 20 at 8; Tabor Aff. ¶ 3c; Bilyeu Reply Aff. ¶ 5.)  Even
assuming that this incident is comparable to either the "overtime
incident" or the "union meeting incident," Ms. Bilyeu confirmed
that Mr. Montgomery was discharged, as was Plaintiff.[12]  (Bilyeu
Reply Aff. ¶ 5.)

Incident Six alleges that Robert Henderson, a black
employee, placed his hands in a hostile manner on Michael Scott
and "had a metal pipe in his hand and was threatening to hit Mr.
Scott."  (Doc. 20 at 9; Tabor Aff. ¶ 3e; Tabor Aff. Ex. 3.)  Ms.
Bilyeu's affidavit recites a very different set of facts.
Specifically, Ms. Bilyeu explained that she understood that Mr.
Henderson threatened to hit Mr. Scott with a drill (not a metal

_____

[12] Ms. Bilyeu also confirmed that Mr. Montgomery was
reinstated as settlement for his grievance but has been on layoff
status since his reinstatement.  However, the fact that certain
employees were reinstated or settled their grievances as a result
of the union grievance process "is not usually probative of
discrimination" since these decisions are not independent,
voluntary decisions on the part of the employer.  Hearne v.
United Parcel Serv., Inc., No. 5:06-CV-117, 2007 WL 3287758, at
*13 (E.D.N.C. Nov. 2, 2007) (citing Hiatt v. Rockwell Int'l
Corp., 26 F.3d 761, 770-71 (7th Cir. 1994)).
    Furthermore, the court has not received any evidence
regarding any possible settlement Plaintiff may have reached with
Defendant over this matter.  Therefore, any evidence regarding
another employee's reinstatement or settlement is not entirely
relevant, since the court is unable to make an accurate
comparison between the two.  For these reasons, only the initial
disciplinary action taken will be considered.

pipe), not <u>kill</u> him, as she interpreted Plaintiff to threaten Mr.
Lovell at the "overtime incident." (Bilyeu Reply Aff. ¶¶ 7, 11.)
She also provides that following the incident, Mr. Henderson was
suspended for five days, ordered to the Employee Assistance
Program, and drug tested upon his return to work. (<u>Id.</u> ¶ 7.)
Again assuming that this incident is comparable to the "overtime
incident," Plaintiff was also offered a five-day unprotested
suspension plus anger management, but he refused that offer and
was suspended for ten days. (<u>Id.</u> ¶ 11.) Furthermore, even
assuming that this incident is comparable to the "union meeting
incident," Defendant has made it clear that it was the
<u>combination</u> of Plaintiff's behavior at the "overtime incident"
and the "union meeting incident" that led to his discharge.
(Klinedinst Aff. ¶ 14.) Plaintiff has not presented any evidence
regarding Mr. Montgomery's past disciplinary record permitting a
comparison to Plaintiff's disciplinary record, or evidence that
Mr. Montgomery's suspension would support any type of inference
of discrimination as to Plaintiff.

Incident Seven alleges that Lyn Harris hit Russell Parker in
the face and chest and, according to Plaintiff, also threatened
to use a gun or knife on him. (<u>See</u> Doc. 20 at 9; Tabor Aff. ¶
3f; Bilyeu Reply Aff. ¶ 8.) Ms. Bilyeu's investigation revealed
that Mr. Harris had slapped Mr. Parker, but did not threaten him

with a weapon, and regardless, Mr. Harris was also terminated.[13]
(Bilyeu Reply Aff. ¶ 8.)  Again, even assuming that this incident
is comparable to those involving Plaintiff, Mr. Harris received
the same discipline as Plaintiff.

Finally, Incident Nine alleges that Lafreda Renwick got into
a physical fight outside the workplace with Kenya Dalton, a
coworker.  (<u>See</u> Doc. 20 at 9; Tabor Aff. ¶ 3h; Bilyeu Reply Aff.
¶ 10.)  The court will again assume that the incident would be
comparable to those that are the subject of this lawsuit.  Even
so, just as Plaintiff was terminated following those incidents,
Ms. Renwick was terminated.[14]  (Bilyeu Reply Aff. ¶ 10.)

There is one additional reason why Plaintiff's claim should
be dismissed for failing to set forth a prima facie case from
which a jury could infer intentional discrimination.  Defendant
has shown that there is no genuine issue of material fact as to
whether the disciplinary decisionmaker - in this case, Mr.
Klinedinst - knew that Plaintiff was bi-racial.  Defendant has
produced evidence that until this lawsuit, Mr. Klinedinst "had

_____

[13] Again, Ms. Bilyeu also confirmed that Mr. Harris was
reinstated as settlement of his grievance, but the court
concludes that this evidence is not probative of discrimination,
nor relevant in this matter.  <u>See</u> <u>supra</u> note 12.

[14] Ms. Bilyeu also stated that Ms. Renwick was given some
money as a settlement, but for the reasons set forth <u>supra</u> note
12, this settlement is not relevant for purposes of comparing the
severity of the discipline imposed.

always believed that Tabor was African-American, as was Lovell."

(Klinedinst Aff. ¶ 7.)  Plaintiff has failed to offer proof that

Mr. Klinedinst knew or should have known that Plaintiff was bi-

racial.  "[T]he McDonnell Douglas elements would not rationally

create [an inference of intentional discrimination] if . . .

there is no showing by direct or indirect evidence that the

decision-maker knew [the plaintiff's race]."  Robinson v. Adams,

847 F.2d 1315, 1316 (9th Cir. 1989) (en banc) (citations

omitted), cert. denied, 490 U.S. 1105 (1988).  See also Cupples

v. AmSan, LLC, 282 F. Appx. 205, 210 (4th Cir. 2008) (affirming

summary judgment where there was no indication or suggestion that

the decisionmakers in plaintiff's case held any discriminatory

views or had any discriminatory intent).

Even assuming, arguendo, that Plaintiff has set forth a

prima facie case of discrimination, Defendant has articulated

legitimate, nondiscriminatory reasons for its employment actions.

As previously discussed, Mr. Klinedinst stated that the that

Plaintiff was terminated because "[t]he [union meeting] incident,

coupled with the October 27 threat against Lovell, showed us that

Tabor was a danger to our workplace."  (Klinedinst Aff. ¶ 14.)

This court will not second-guess the employer's decision to take

such an action in order to ensure safety in the workplace.  See

DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998)

(the court "does not sit as a kind of super-personnel department

weighing the prudence of employment decisions made by firms charged with employment discrimination . . . . Our sole concern is whether the reason for which the defendant discharged the plaintiff was discriminatory." (internal citations and quotations omitted)).  Accordingly, any presumption of discrimination that would arise from a prima facie case of discrimination would no longer be present.  For reasons similar to those discussed above, there is no evidence demonstrating that Defendant's articulated, legitimate reason is merely pretext.

In sum, after reviewing the record as a whole, this court concludes that Defendant has demonstrated that there is no genuine issue of material fact for trial.  Given the admissible evidence submitted, a reasonable jury could not conclude that Defendant's discipline was based on Plaintiff's race.  Defendant has produced evidence demonstrating that no one outside of Plaintiff's protected class engaged in comparable conduct and received less severe discipline for that conduct, and Plaintiff has not produced admissible evidence suggesting otherwise. Additionally, Defendant has produced evidence demonstrating that the disciplinary decisionmaker did not know that Plaintiff was bi-racial, and thus intentional discrimination cannot be reasonably inferred.  As Defendant has met its burden of demonstrating that there is no genuine issue of material fact for

trial, and Plaintiff has not produced sufficient evidence to show
that there is a genuine issue, summary judgment will be granted.

## V.    Conclusion

For the reasons set forth herein, Defendant's Motion for
Summary Judgment (Doc. 17) is GRANTED.  A judgment in accordance
with this opinion will be filed contemporaneously herewith.

This the 1st day of May 2009.


William L. Osteen, Jr.
United States District Judge